**WILLIAMS ENTERPRISES, INC., and Strait Manufacturing and Welding, Inc., Appellants,**

v.

**The SHERMAN R. SMOOT COMPANY, Appellee.**

No. 90–7091.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 11, 1991.

Decided July 9, 1991.

As Amended on Denial of Rehearing and Rehearing En Banc Oct. 8, 1991.

232

Philip Clark Jones, for appellants.

John Hardin Young, for appellee.

Before RUTH BADER GINSBURG, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the court filed by Circuit Judge HENDERSON.

HENDERSON, Circuit Judge:

On September 25, 1984, the steel frame of a building under construction collapsed, causing one death and several serious injuries. The primary contractor, The Sherman R. Smoot Company (Smoot), filed claims against both its subcontractor, Strait Manufacturing and Welding, Inc. (Strait), and Strait's subcontractor, Williams Enterprises, Inc. (Williams). The district court held both subcontractors liable for damages in excess of $493,000. Williams, after assuming sole responsibility for the legal defense, now appeals that award. We affirm the district court's decision in all aspects except its calculation of the cost of capital award and remand for a recalculation of that award. We also impose a $500 sanction on Williams's counsel due to his flagrant disregard of this court's orders and rules.

## I.

Coolidge High School, located in the District of Columbia, needed a new gym. After a round of competitive bidding, Smoot was awarded the contract to build the gym. Smoot subcontracted with Strait for the fabrication and erection of the steel frame for the gym and Strait then subcontracted with Williams for the erection of the steel frame. As the frame was being erected, one of the steel towers supporting the structure began to visibly lean to one side. Williams continued to construct the frame, ignoring the warnings of both the on-site project manager and the District of Columbia building inspector. Five days after the warnings, the tower came tumbling down, taking the entire edifice with it. One worker was killed and two others were seriously injured. The Occupational Safety and Health Administration (OSHA) investigated the collapse and determined that Williams had committed several serious safety violations, including four willful violations. There is no dispute here that Williams was negligent or that its negligence was the sole cause of the collapse.

This litigation began when Williams sued Strait to recover funds retained by Strait. Strait then joined Smoot as a third-party defendant, also claiming retention. Smoot, in turn, brought claims against both Strait and Williams, alleging breach of contract and negligence as against Strait and negligence as against Williams. While the litigation was pending, Strait and Williams entered into an indemnity agreement by which Williams agreed to pay all of the damages resulting from Smoot's claim and to assume full responsibility for the legal defense. In addition, Smoot agreed to pay Strait the outstanding balance owed it, once Smoot's claim for damages was finally resolved.

The district court tried the case without a jury and found Strait and Williams liable to Smoot for the damages caused by the collapse. The court assessed damages totalling $493,030, plus a cost of capital award. Damages were awarded for (i) increased insurance premiums, (ii) unabsorbed home office overhead, (iii) construction expenses caused by the construction delay (including equipment costs, extra labor and escalated winter protection costs), (iv) loss of labor productivity and wage escalation, and (v) attorneys' fees. On appeal Williams challenges each of these items as well as the cost of capital award. It also appeals the district court's decision not to offset the damage award by the outstanding balance amount Smoot promised to pay Strait. We address each issue in turn.

## II.

Williams first challenges the award of damages for increased insurance premiums. In awarding these damages, the trial judge credited the testimony of Smoot's insurance broker, who had worked on Smoot's account for over twelve years. The broker testified that the construction collapse caused Smoot's insurance premiums to increase by $45,000 per year and that this increase would continue for at least three years. Williams makes three challenges to this damage award. First, it claims the broker, who testified as a lay witness, should not have been permitted to offer his opinion as to why the premiums increased. Second, Williams argues that the broker, even if qualified as an expert, was not qualified to testify about what factors the insurance carrier considered in deciding to raise Smoot's premiums. That question, says Williams, can be answered only by the carrier's agent himself. Finally, Williams claims that the broker's testimony, if admissible, was insufficient as a matter of law to establish that Williams's negligence was the proximate cause of the insurance premium increase.

■ We reject Williams's contention that the district court erred by allowing Smoot's insurance broker to testify as a lay witness about what, in his opinion, caused the increase. Rule 701 of the Federal Rules of Evidence provides that a witness not testifying as an expert may offer his opinion only if it is (i) "rationally based on the perception of the witness"; and (ii) "helpful to a clear understanding of his testimony or the determination of a fact in issue." The insurance broker's testimony meets

both of these requirements. His opinion was based on facts that were personally known to him (*i.e.*, the history of Smoot's account and the circumstances surrounding the increase) and the court, acting as the trier of fact, expressly found that the testimony would be helpful.

The fact that the broker based his opinion on specialized knowledge and might have been able to offer his opinion as an expert does not mean he was required to do so. As long as he had personal knowledge of the facts, he was entitled to draw conclusions and inferences from those facts—regardless of whether he applied any specialized expertise. *See Teen–Ed, Inc. v. Kimball International, Inc.*, 620 F.2d 399, 402–04 (3d Cir.1980) (plaintiff's accountant could under Rule 701 project lost profits based on his familiarity with records); *Farner v. Paccar, Inc.*, 562 F.2d 518, 528–29 (8th Cir.1977) (witness familiar with truck suspension system could under Rule 701 offer opinion on its design); *United States v. Pierson*, 503 F.2d 173, 176 (D.C.Cir.1974) (police officer may testify as lay witness about bullet trajectory, based on personal observations of the crime scene). Moreover, Williams concedes that it anticipated the opinion testimony and was not unfairly surprised by it. *See Queen v. Washington Metro. Area Transit Authority*, 842 F.2d 476, 482–83 (D.C.Cir.1988).

■ We also reject Williams's contention that only the carrier's agent could testify about the cause of the increase. The fact that a person other than the witness may have had first-hand knowledge of what caused the premium increase does not mean that the witness could not give his own explanation of the cause. There is no evidence or even suggestion that the carrier's decision to raise the premiums was based on personal whim. Smoot's insurance broker was not confronted with the task of guessing what factors went through the carrier's agent's mind when he decided to raise Smoot's premiums (as Williams suggests) but was merely asked what factors might have contributed to that raise. Because the witness had personal knowledge of Smoot's insurance account and was familiar with factors that affected the account, he was qualified to give his opinion as to whether a certain factor (*i.e.*, the collapse) caused the increased premiums. *See Teen–Ed*, 620 F.2d at 403; Fed.R.Evid. 602.

■ Finally, the district court's finding that the collapse was the proximate cause of the increased premiums is supported by substantial evidence. Although Williams suggests that a series of lawsuits against Smoot was the real cause of the increase, it did not present any evidence or testimony at trial to substantiate this claim.[1] Given the evidence produced by Smoot and Williams's total failure of proof, we cannot conclude that the district court committed legal error in determining that Williams's negligence proximately caused the increased insurance premiums.[2]

### III.

Williams next challenges the district court's award of damages for unabsorbed home office overhead. According to the court, Williams's negligence caused the project an 83–day delay. In calculating the damages attributable to the delay, the district court employed a method of calculation known as the "*Eichleay* formula," first developed by the Armed Services Board of Contract Appeals in *Eichleay Corp.*, 60–2 B.C.A. (CCH) ¶ 2688 (1960), *aff'd on reconsideration*, 61–1 B.C.A. (CCH) ¶ 2894 (1961). That formula requires the following three-step analysis:

[1] The total home office overhead for the contract performance period is multiplied by the ratio of contract billings to total company billings; this calculation results in the amount of home office overhead allocable to the contract. [2] That amount is then divided by the number of days of contract performance; the

---

1. The only evidence even suggesting the possibility that the increase was caused by Smoot's rather than Williams's negligence is the testimony of Smoot's broker that (1) the fatality of a worker who is not the employee of an insured "could affect [the insured's general liability premiums], should he be in a claim that the death occurred as a result of his mismanagement or the mismanagement of his supervisors" and (2) Smoot's "exposure" was "the possibility of some other trade's worker getting hurt and trying to get around workmen's comp" by "suing Sherman R. Smoot for negligence."

2. We emphasize that our conclusion is not a rule of broad application but is based on the evidence presented and limited to the facts of this case.

result is the daily home office overhead rate allocable to the contract. [3] That rate is then multiplied by the number of days of delay; the result is the amount of recovery.

*George Hyman Constr. Co. v. Washington Metro. Area Transit Authority*, 816 F.2d 753, 757 (D.C.Cir.1987). Williams claims that the court erred: (i) in incorrectly assuming that the delay caused Smoot to incur uncompensated expenses, without inquiring whether these expenses could have been avoided; and (ii) in applying the *Eichleay* formula here because that formula is accurate only if there is a suspension, not an extension, of work.

 Williams's first complaint carries little weight. In order to recover damages for home office overhead costs, Smoot "must show that [it] necessarily suffered actual damage because the nature of the delay made it impractical for [it] either 'to undertake the performance or other work' or 'to [cut back on] Home Office personnel or facilities.'" *George Hyman*, 816 F.2d at 757 (quoting *W.G. Cornell Co. v. Ceramic Coating Co.*, 626 F.2d 990 at 994 (D.C.Cir.1980) (per curiam) and *Eichleay Corp.*, 61–1 B.C.A. at 15,117). In other words, Smoot must be able to show that it was unable to avoid the additional home office overhead costs. *See Massman Construction Co. v. Tennessee Valley Authority*, 769 F.2d 1114, 1125 (6th Cir.1985), *cert. denied*, 476 U.S. 1104, 106 S.Ct. 1947, 90 L.Ed.2d 357 (1986). We do not, however, require a contractor to show specific harm when the delay was sudden and unpredictable. *See George Hyman*, 816 F.2d at 757–58. In that situation, we presume that the contractor could not have secured additional work or arranged for a layoff because he had no time to do so. Here, we are clearly confronted with that situation: the collapse occurred suddenly and unpredictably, giving Smoot no opportunity to mitigate its loss. Accordingly, Smoot did not need to establish that it had no opportunity to obtain work elsewhere.

 Williams next argues that it is improper to apply the *Eichleay* formula when a project is extended, but not suspended.

According to Williams, the theory underlying the *Eichleay* formula is that during a suspension, "there is no money coming in from work on the contract, and there is often uncertainty as to how long the suspension will last, which prevents the contractor from taking on other work while waiting to return to the project." Rep.Br. 15. That rationale, says Williams, does not support the application of the formula to work extensions. We fail to see the distinction. It may be true that when a project is extended (not suspended), the work will be ongoing and thus income from the project will continue to be applied to home office overhead costs. On the other hand, when work is extended, the project income will be spread over a longer period of time and, consequently, less of the income may be allocated to home office overhead costs. Thus, an extended project—like a suspended project—may result in reduced income vis-à-vis overhead costs.

In any event, we need not engage in a full blown analysis of the economic assumptions behind the *Eichleay* formula. This circuit, like others, has been willing to apply the formula to work extensions like the one here. *See, e.g., George Hyman Construction Co.*, 816 F.2d at 758; *Capital Electric Co. v. United States*, 729 F.2d 743 (Fed.Cir.1984). Indeed, in *Capital Electric*, the government presented the same argument raised by Williams and that court expressly rejected it. *See* 729 F.2d at 747–48 (Friedman, J., concurring). Accordingly, we find no fault with the district court's application of the *Eichleay* formula.

### IV.

 In calculating the amount of delay caused by Williams, the district court determined that the total delay related to the collapse was 106 days. It then subtracted from that total 23 days, which the court attributed to "actual progress achieved by Williams on the Project, minor change order work accomplished, and an allowance for the fact that the first precast panels were not ready for erection" on time. Joint Appendix (JA) I–7. Additionally, the court rejected Williams's claim that Smoot was in part responsible for the portion of

the delay attributed to Williams (83 days) and should not be able to recover from Williams all of the losses caused by it. The district court's calculation, according to Williams, was wrong because the court was obligated to calculate the total project delay (rather than the delay caused by the steel collapse) and then allocate the portions of the delay attributable to Williams and to Smoot.

We agree with the district court's calculations. The construction project was scheduled according to the "critical path method," that is, the work was to progress in rapid sequence and each subcontractor was to perform its work within a limited, allotted time frame. According to expert testimony, a delay caused by one subcontractor during this type of construction project necessarily results in the delay of the entire project. Because the court credited this testimony, it did not need to scrutinize the project as a whole to determine whether the collapse caused the total project to be delayed: it could and did reach that conclusion solely on the basis of the fact that one portion of the project was delayed.

Moreover, the district court did not err in finding that Smoot did not contribute to the 83–day delay. The court first pointed out that Williams began the steel construction on schedule and therefore concluded that nothing preceding the construction contributed to the delay. The court then rejected Williams's argument that the delay in the production of precast concrete panels, which were to be hung from the steel structure built by Williams, would have caused the delay even if the structure had not collapsed. The court found that, although the panels were not ready until after Williams had removed the collapsed structure and then completed its job, they would have been completed much earlier if the collapse had not occurred because the panel manufacturer would have had to meet a specific deadline. *See* JA I–10–11. Specifically, the court found that the panels, which had been due on October 16, would have been available on November 8, 1984, had the steel frame not collapsed. The court accordingly adjusted its calcula-

tion of the delay attributable to Williams to reflect the slight delay caused by the late availability of the precast panels. This adjustment was reasonable and we affirm the district court.

### V.

■ Williams next claims there is no substantial evidence to support the award of damages for loss of labor productivity and escalated wages. Smoot offered expert testimony that the delay led to lower work productivity and required workers to stay on the payroll past the time when their wages increased. *See* JA III 33–35, 48–49, 151. Williams claims that this evidence fails to prove that Smoot was in fact harmed by lost productivity but instead addresses only the measure of damages. We fail to see the distinction drawn by Williams. The testimony given by Smoot's expert and credited by the court indicated that, after the collapse, labor related costs were significantly higher than they should have been and that these increased costs were attributable to lost morale. This type of evidence is sufficient to establish both that Smoot suffered harm and the quantum of that harm. *See U.S. Industries, Inc. v. Blake Construction Co., Inc.,* 671 F.2d 539, 547 (D.C.Cir.1982).

Williams also claims that the increased labor wages could not be attributed to the collapse because the collapse caused additional work to be performed at that time, not at the end of the project. As we have already noted, the district court correctly concluded that the delay caused by Williams delayed the entire project. Thus the district court correctly concluded that the extra wages paid at the end of the project would not have been paid had the collapse not occurred.

### VI.

■ Next Williams challenges the district court's award of attorneys' fees. The Smoot–Strait subcontract provided that, in the event of litigation between the parties, "the prevailing party shall be entitled to recover a reasonable attorneys' fee in addition to any other relief granted by the

court." JA I–22. Williams concedes that it agreed to pay all of Strait's damages resulting from this action. Nonetheless Williams now argues that it never "contemplated" that it would be responsible for paying attorneys' fees and that it never consented to do so. Williams provides no evidence or argument explaining why the indemnification agreement does not cover attorneys' fees and therefore we have no basis to conclude that it does not do so.

■ Williams also argues that the district court erred by failing to conduct a post-trial hearing on attorneys' fees. The District of Columbia Court of Appeals has directly spoken to this issue:

> [I]f the court deems it necessary, or if either party desires, testimony *may* be taken as to the nature of services rendered or the reasonable value thereof. . . . Lest there be any uncertainty, we now make explicit that the trial court retains discretion to decide the nature of proof necessary to establish the facts affecting its decision as to the amount of fees to award.

*Nolan v. Nolan,* 568 A.2d 479, 490 (D.C. 1990) (quotation marks omitted; original emphasis; citing *Central Fidelity Bank v. McLellan,* 563 A.2d 358, 360 (D.C.1989)); *see also Tyler v. Dixson,* 57 A.2d 648, 650 (D.C.1948). The rationale behind this rule is that "the trial judge, in view of his or her experience on the bench and at the bar, may be in a position, without more, to make the determination of reasonableness." *Central Fidelity,* 563 A.2d at 360 n. 8. Because District of Columbia law is controlling here, *see Nepera Chemical, Inc. v. Sea–Land Service, Inc.,* 794 F.2d 688, 694–95 (D.C.Cir.1986), we are constrained to conclude that the district court did not err by failing to conduct a hearing on attorneys' fees.

## VII.

■ In the agreement between Smoot and Strait, Smoot agreed to pay Strait $28,-140 after the final resolution of the delay claim "either by settlement [or] judicial ruling, including all appeals." Williams asked the district court to offset that amount against any award it was ordered to pay.

The court declined to do so and Williams appeals that decision.

In support of this argument Williams cites no authority nor even a reason for the court's alleged error. Instead it simply asserts, as if it were self-evident, that the court should have offset the damages awarded to Smoot. We do not find Williams's assertion to be self-evident. Indeed, in light of the specific settlement language, we do not see any basis for Williams's argument. The settlement plainly states that the amount owed by Smoot will not be payable until the conclusion of the delay claim, including all appeals. Because that condition has not yet been satisfied, Williams has no basis for its request.

A basic rule of appellate practice is that arguments "shall contain the contentions of the appellant with respect to the issues presented, *and the reasons therefor, with citations to the authorities . . . relied on.*" Fed.R.App.P. 28(a)(4) (emphasis added). Appellate review is not a process whereby a party throws every conceivable issue into a hopper and hopes for a favorable result to pop out. This court's time (as well as that of the appellee) is squandered when we are needlessly forced to decide an issue so lacking in merit that even the appellant's lawyer cannot provide a reason to support it. We do not approve this "potluck" approach to appellate practice and, although we will not do so in this instance, we warn that we may penalize counsel for raising arguments so wholly without merit. *See* D.C.Cir.R. 23, 28 U.S.C. § 1927.

## VIII.

■ Last, Williams challenges the district court's decision to award Smoot the cost of its lost capital, calculated on the basis of the total amount of Smoot's damages. According to Williams, a cost of capital award is in effect an award of prejudgment interest and thus is not recoverable in tort under District of Columbia law. To support this contention, Williams relies on *Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835 (D.C.Cir.1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). But the District of Columbia Court

of Appeals has repeatedly questioned whether *Schneider* properly interpreted District of Columbia law, *see George Hyman Construction Co. v. DiNicola*, 514 A.2d 1180, 1182 n. 4 (D.C.1986); *Bell v. Westinghouse Electric Corp.*, 507 A.2d 548, 555 n. 5 (D.C.1986), and in a recent case it determined that *Schneider* was wrong, *see Duggan v. Keto*, 554 A.2d 1126, 1139–40 (D.C.1989). In *Duggan* the court concluded that "pre-judgment interest in tort actions in the District of Columbia is neither authorized nor forbidden by statute." It further held that prejudgment interest is permitted under common law, at least in actions for conversion. *Id.* at 1140.

It remains unclear whether prejudgment interest is available in a negligence action. Nonetheless, this ambiguity need not be resolved here because District of Columbia law unequivocally allows prejudgment interest in contract actions. *See id.* (citing D.C.Code § 15–108). In addition to finding Williams negligent, the district court found that Strait had breached its contract with Smoot. Given this finding, the court could properly hold Strait liable for the cost of capital. Further, because Williams agreed to indemnify Strait in full, the court did not err by including the cost of capital in the damage award assessed against Williams— whether or not District of Columbia law allows a cost of capital award in a negligence action.

The district court did err, however, in calculating the cost of capital award. The court performed a two-step analysis: first, it totalled the amount of damages caused by the delay; then, it determined the interest that would have accumulated on that amount during the time between the collapse of the steel structure (when the costs were presumably incurred) and the last day of the trial. The problem with this calculation is that it assumes all of the damages assessed by the court were incurred at the time of the collapse. That assumption, however, is incorrect. For example, the court awarded Smoot damages for its increased insurance premiums which were incurred over the three years following the collapse, not at the time of the collapse. Likewise the court awarded legal fees which were also incurred over an extended period of time. By treating these costs as having been incurred at the time of the collapse, the district court was, in effect, compensating Smoot for the loss of capital it had not yet lost. Accordingly, we remand this issue to the district court so it may recalculate the cost of capital award based on when the losses occurred.

## IX.

■ The conduct of Williams's counsel in prosecuting this appeal has been egregious. Before submitting his briefs, counsel moved to file briefs exceeding the normal page limits. *See* D.C.Cir.R. 11(d) (principal briefs not to exceed 50 typewritten pages and reply briefs not to exceed 20 typewritten pages). The motion was denied. Rather than comply with the order, however, counsel sought to evade it. He printed his briefs in such minuscule type that, had they been typed in a proper size, the main brief would have exceeded 90 pages and the reply brief would have exceeded 35 pages. *See* Fed.R.App.P. 32(a) ("[a]ll printed matter must appear in at least 11 point type"). We returned the briefs to counsel with an order instructing him to submit conforming briefs within one week. Counsel again attempted to skirt the court's rule and order. This time he used type that was slightly larger than originally used but still smaller than normal type. Again, we returned the briefs and ordered counsel to submit conforming briefs within twenty-four hours. In response counsel finally adjusted his typeset to the proper size and we accepted the briefs. We note, however, that in his third effort, Williams's counsel indented the first line of each paragraph only one or two spaces rather than five spaces; he extended the margins on block quotations; one page (page 33) was one-and-a-half spaced rather than double spaced; and all of the citations in the main brief were tucked into footnotes. In short, counsel made prodigious efforts to squeeze the maximum amount of text into his briefs and, in doing so, evaded the governing instructions. *See* Fed.R.App.P. 32(a) (requiring double spacing between each line of text); D.C.Cir.R.

11(d) (cautioning against manipulation of footnotes to evade specified page limits). At argument counsel acknowledged that he himself had typed the briefs.

There is no excuse for counsel's flagrant disregard of this court's rule and orders. We waste precious time and resources when compelled to measure margins and typefaces in the work submitted to us and to upbraid those lawyers who do not comply with our rules or heed our orders. The Seventh Circuit summed up the situation quite well:

> Lawyers must comply with the rules and our orders rather than hope to put one over on the court and to apologize when caught. The penalty for a violation should smart. Even if only negligence was at work, counsel must learn to be alert. The offense here "multiplied the proceedings" by requiring the judges and counsel for the Board to examine two sets of briefs for Westinghouse. We accordingly use our power under 28 U.S.C. § 1927 and impose a penalty of $1,000. Counsel may not pass this penalty on to Westinghouse.

*Westinghouse Elec. Corp. v. NLRB*, 809 F.2d 419, 425 (7th Cir.1987); *see also EDC, Inc. v. Navistar Int'l Transp. Corp.*, 915 F.2d 1082 (7th Cir.1990). We agree with the Seventh Circuit's approach. Pursuant to 28 U.S.C. § 1927, we order Williams's counsel personally to pay to the clerk of this court a penalty in the amount of $500. Williams's counsel is further instructed that he is not to pass the penalty on to Williams.

In conclusion, we affirm the district court in all respects except its calculation of the cost of capital award. We remand for recalculation of that award and also sanction Williams's lawyer for his repeated failure to comply with our rule and orders.

*It is so ordered.*