United States Court of Appeals
Fifth Circuit

**F I L E D**

July 17, 2003

Charles R. Fulbruge III
Clerk

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 02-30533

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JOHN HERRING, also known as JOHN MORRIS HERRING, SR.
and MARTHA SEWELL, also known as MARTHA HERRING,

Defendants-Appellants.

Appeal from the United States District Court
for the Eastern District of Louisiana
U.S.D.C. No.00-171(K)

Before DAVIS, JONES and BENAVIDES, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:[1]

John Herring and Martha Sewell Herring appeal their convictions and sentences for

conspiracy, theft from pension plans, health care fraud and bankruptcy fraud arising out of their

relationship with a chain of home health agencies they owned. They challenge the district court's

instructions to the jury, admission of certain testimony and calculation of loss for sentencing

purposes.[2] Finding no error, we affirm.

---

[1]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be
published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

[2] We decline to consider the issues raised by the defendants in their letter submitted under
Rule 28(j) that were neither raised in the district court or argued in their initial brief.

I.

John and Martha Herring were charged and convicted of violating 18 U.S.C. §§ 371 (conspiracy), 664 (theft from pension plans), 1347 (health care fraud), and 157(1) and (2)(bankruptcy fraud). Martha Herring was charged and convicted of two additional counts of bankruptcy fraud in violation of 18 U.S.C. §§ 157(1) and (2). The Herrings' affiliated entities, Home Care Center, Inc. ("HCC"), Southern Style Success, Inc. ("SSS, Inc."), Success Southern Style, L.L.C. ("SSS, LLC"), Golden Goose Enterprises, Inc. ("the Goose"), and Goldco International, Ltd. ("Goldco"), were also charged with conspiracy. Most of the charges relate to the Herrings' ownership of a chain of home health agencies in Louisiana - Golden Age of Baton Rouge, Golden Age of Shreveport, Golden Age of Monroe, Golden Age of Houma and Golden Age of the South (located in Hammond) (collectively, the "Agencies"). HCC served as the Agencies' home office and was owned by and employed the Herrings.

The Agencies served mainly Medicare patients. To obtain reimbursement from Medicare, at the end of each fiscal year, a cost report was prepared by each Agency and submitted to Medicare. Under the reporting procedure, all costs associated with running the Agencies are included on the reports, but Medicare reimburses only those costs that are reasonable, necessary and related to patient care. Employee benefits such as pension plans, paid days off and bonuses, and certain employee appreciation expenditures are costs allowed by Medicare. The cost reports are used to derive pay rates for different care services. Services are then billed to Medicare at those rates. When Medicare pays for patient care visits, it is reimbursing the Agencies for allowable expenses submitted on the cost reports. Some costs are allowed to be accrued and listed as debts on the cost report, including paid days off, retropay and pension plan contributions.

2

Medicare allows the Agencies one year from the end of the reporting year to pay these debts unless the Agency provides an acceptable reason for an extension. All funds collected from Medicare are destined to be paid out for approved expenses. The Agencies were thus all non-profit ventures.

HCC provided administrative and management services to the Agencies. HCC's operating costs were allocated to the individual Agencies. Before allocation, HCC subtracted the costs of services provided to related entities which did not provide patient related services from its cost report because Medicare does not pay for non-patient related services. In addition to serving the Agencies, HCC served SSS, Inc., the Goose, Goldco and SSS, LLC. SSS, Inc was a real estate holding company which purchased property to rent to the Agencies. Goldco was a consulting business that was designed to be a cash generating business. The Herrings billed it as offering expertise in all things related to Medicare and home health agencies. The Goose, another profit seeking venture, was a day care center providing Medicare-reimbursed services as benefits to employees of the Baton Rouge agency and HCC.

The Herrings created pension plans for the Agencies and HCC. The plans were purchased between 1990 and 1992 from Pension Administrators & Consultants, a company headed by Dwight Cenac. Cenac marketed the plans as having the benefit that employers could borrow from the plan assets. That position might be defensible in some circumstances under Medicare regulations, but did not consider ERISA rules. In the fall of 1992, Chris Uhland, one of Cenac's accountants determined that ERISA did apply to the plans and prohibited the loans. Cenac testified that he had his company send a "Client Alert" regarding the matter to all of his pension clients, including the Agencies, in October 1992. Uhland testified that on December 1, 1992, he

3

mailed or faxed a letter to the Herrings in which he repeated this information. The Herrings claim that they never received this information. They testified that they learned of the possible prohibition of these loans under ERISA regulations in September 1994, when, after firing Cenac's company, their new accountants investigated the situation and concluded that the plans were covered by ERISA and that ERISA regulations prohibited loans to the employers without the approval of the Department of Labor.

Prior to September 1994, the Herrings directed that contributions be made to the pension plans. They also caused their related businesses to borrow money from the various pension plans in the following series of transactions:

(1)     In 1992, SSS, Inc. purchased property in Houma, Louisiana for $200,000 with bank financing. Certificates of deposit owned by three agency pension plans were pledged as collateral for the loan.

(2)     Shortly thereafter, HCC funded the down-payment on property in Sherwood Forest in Baton Rouge. The purchase price was paid with $368,000 from the Monroe Agency which had been earmarked to fund the pension plan and pay other accrued debts.

(3)     SSS, Inc. renovated a floor of the Sherwood Forest property as a conference facility for Goldco. HCC deposited Medicare funds into various plan accounts. The funds were then transferred to SSS, Inc., which paid the contractor.

(4)     In 1993, SSS, Inc. purchased a building in Bastrop for $87,000. The Herrings caused the pension plans to be funded, then transferred funds to SSS, Inc. which paid for the building.

(5)     Also in 1993, SSS, Inc. purchased a building in Monroe for $200,000 with a $25,000

4

deposit. The deposit came from funds funded into a pension plan and then transferred to SSS, Inc.

(6)     In 1994, SSS, Inc. purchased two lots near the Sherwood Forest building for $49,000 to build a facility for the Goose. Funding came from HCC to one of the pension plans and then to SSS, Inc.

In simple terms, when the Herrings wished to purchase property for the use of the Agencies or their related for-profit businesses, they would transfer funds due to the pension plans from the Agencies or HCC (which held Agency funds) into the plan accounts and then immediately withdraw the funds from the plans to purchase property or pay for improvements. The pension plans were granted secured mortgages on most of the properties purchased with plan funds.

In December 1993, to raise additional funds for the Goose, the Herrings had the pension plans funded and then had the funds purchase $250,000 in Goose preferred stock. In June 1994, this process was repeated and the funds used to purchase an additional $250,000 in Goose preferred stock.

At the urging of Harvey Rennhoff, then HCC director of operations who was concerned about the loans, the Herrings pledged all of their stock in SSS, Inc., the Goose, Goldco and HCC and the Agencies to the pension plans. The plan trustees were not aware of the pledge. They learned of it when the Herrings later altered the agreement to substitute newly created SSS, LLC units for stock of SSS, Inc.

At the end of 1995, it was time to pay the 1994 accrued liability to the pension plans. The Herrings filed for an extension claiming Medicare-related cash flow problems. Two months later in February 1996, the Herrings withdrew $500,000 from HCC and deposited it in SSS, Inc.,

5

which used the funds to make a partial payment on a house on Highland Road for the Herrings. The total purchase price was approximately $1.2 million. In June 1996, John Herring directed HCC to transfer funds to SSS, Inc. to cover the balance of the purchase price. Since the Agencies are non-profit businesses, every dollar that the Herrings withdrew reduced the funds available to pay the costs of the Agencies.

To pay the pension funds owed, the Herrings discounted the Agencies' Medicare receivables with Healthcare Capital Resources. At the end of 1996, the pension plan liability was paid for 1994 but extended for 1995. At the end of 1997, Medicare denied a request for an extension to pay the 1996 pension debt because the Agencies had misdirected available funds to related third parties.

At trial, the government presented evidence that the Herrings used Agency funds for first class travel, expensive dinners, and personal expenses. A Medicare audit resulted in some of these expenses being disallowed. By the time of the audit and disallowance, the Agencies had already been reimbursed. As a result, the government withheld the disallowed amounts from future reimbursements. This led to cash flow problems which caused the Herrings to put the Golden Age Agencies into Chapter 11 bankruptcy.

At the time of the bankruptcy, the Herrings, Goldco and the Goose owed the Agencies significant amounts of money. Herring refinanced the Highland Road house but it is not clear if any of the funds went to the Agencies. Funds due from the Herrings, Goldco and the Goose were not disclosed as assets on the Agencies' bankruptcy schedules.

The Herrings found a buyer for the Agencies and HCC. The buyer required that the pledges against the Agencies' stock in favor of the pension plans be released. The Herrings

6

caused the pledges to be released without replacing the stock with any other security. They received employment contracts with the buyers.

Martha Herring anticipated having to file for personal bankruptcy due to lingering debts related to her prior ownership of a New Orleans area home health agency. In an attempt to protect a house she owned in Pass Christian, Mississippi, she donated it to an LLC she created in her son's and daughter's names. She testified that her attorney had advised her that property transferred more than one year prior to filing bankruptcy would be excluded from the bankruptcy estate. The LLC was created in May 1995. The organization documents for the LLC included Martha Herring as a member of the LLC, although her intent was that only her children be members. The LLC documents were later amended to remove her as a member on October 8, 1995. The Pass Christian property was donated to the LLC by a document executed on June 8, 1995, but recorded June 23, 1995. Although listed as a member of the LLC, her son had no knowledge of his membership interest in the LLC or the donation. Martha Herring filed for bankruptcy on June 21, 1995, short of the one-year period from the recordation of the property transfer. Martha Herring did not list the Mississippi property as an asset on her schedule of assets filed in her bankruptcy petition.

As a result of their convictions, the Herrings were sentenced to 84 months imprisonment on the health care fraud count and to 60 months imprisonment on each of the other counts to be served concurrently. They were each ordered to pay restitution to Stanford Trust, the fiduciary for the Agencies' pension plans, in the amount of $4,390,832, Home Care Center Pension Plan in the amount of $970,761, Medicare in the amount of $405,738, and Healthcare Capital Resources in the amount of $1,856,895. The Herrings timely appealed.

7

## II.

The Herrings complain first that the district court's jury instructions allowed them to be convicted of pension plan theft without a finding of criminal *mens rea*. The statute they were charged under, 18 U.S.C. § 664, provides that "[a]ny person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan or of any fund connected therewith, shall be fined under this title or imprisoned not more than 5 years, or both." The Herrings requested the following willfulness instruction:

> As used in these instructions regarding allegations of Pension Plan Fraud and Medicare Fraud, the term "willfulness" requires the Government to prove that the law imposed a duty on the defendant, that the defendant knew of this duty, and that he voluntarily and intentionally violated that duty.

The district court accepted, in principle, the Herrings' suggestion and charged the jury that "willful" for purposes of this count means "the voluntary and intentional violation of a known legal duty - in this instance, the defendants' fiduciary duties under ERISA." Except for an explanation of the nature of the legal duty the government contended the Herrings violated, the court's charge is substantially the same as the one the Herrings requested. The court summarized the instructions as follows:

> [i]f you find that a defendant was (1) a fiduciary of the employee benefit plans, (2) that the defendant was aware of his or her fiduciary duties with respect to the handling of assets of the employee benefit plans as described in Counts 1 or 2, and (3) that the defendant's unlawful taking of the assets of the employee benefit plans voluntarily and intentionally violated those fiduciary duties, then you may also find that the defendant possessed the criminal intent to deprive the employee benefit plans of the use of their assets and property.

8

The Herrings did not object to the instructions as given. Thus, if these instructions were erroneous at all, which is doubtful, the error was invited by the appellants and they are precluded from challenging it. United States v. Baytank (Houston), Inc., 934 F.2d 599, 606-07 (5th Cir. 1991).[3]

III.

The defendants argue next that the trial was tainted by evidence of civil regulatory violations, personal attacks on the Herrings and misleading testimony, both by individual claims of error and by the cumulative effect of the alleged errors.

A.

The defendants argue first that the district court abused its discretion in admitting testimony regarding the Department of Labor's ("DOL") civil proceedings against the Herrings as to pension plan liability and in admitting testimony regarding DOL's complaints that charges the Herrings submitted on the Agencies' Medicare cost reports were improper. This testimony, they submit, was more prejudicial than probative and resulted in the Government bootstrapping civil regulatory violations into felony convictions. The district court's decision to admit or exclude this evidence over the defendants' objections is reviewed for an abuse of discretion. United States v. Gutierrez-Farias, 294 F.3d 657, 662 (5th Cir. 2002).

Specifically, the defendants argue that the testimony of two government witnesses was

---

[3] Although the defendants focus on this single charge, the district court in explaining the specific terms of §664 gave the jury further guidance on the elements of the offense, specifically the definitions of conversion and embezzlement. The instructions properly defined criminal conversion as "the wrongful taking of money or property belonging to someone else with intent to deprive the owner of its use or benefit either temporarily or permanently." The instructions also properly defined embezzlement as "the wrongful or willful taking of money or property of someone else after the money or property has lawfully come into the possession or control of the person taking it."

9

more prejudicial than probative in violation of Rule 403 and its admission requires reversal of their convictions. The first witness was Mary Witherow, the DOL attorney in charge of the civil suit against the Herrings. Over the objections of the defendants, Ms. Witherow testified about the civil suit against the Herrings, particularly that the Herrings had admitted that they violated ERISA. She also testified about settlement negotiations between DOL and the Herrings. Ms. Witherow identified a series of exhibits related to the civil case consisting of correspondence between the DOL and the Herrings discussing purported ERISA violations and various settlement proposals. Two limiting instructions were given by the court during her testimony. In the first, the court instructed the jury that "merely because civil proceedings were instituted against the Herrings and related health care entities does not mean or indicate that they were in any way guilty of the criminal charges that are filed here." Later the court instructed the jury that the words "good faith" in the civil case scheduling order admitted into evidence had nothing to do with the criminal case, rather that they related to discovery in the civil case only. In addition the district court reviewed the exhibits, excluding those it found to be unfairly prejudicial.

The second witness was Bruce Ruud, an ERISA expert. Over the defendants' objections that he was testifying regarding legal opinions as to the ultimate issue in the case, Ruud testified that the loans from the pension plans were prohibited transactions under ERISA. Again the district court gave a limiting instruction that "simply because his opinions and his testimony may be to the effect that the defendant, some or all of the defendants engaged in prohibited transactions under ERISA does not necessarily mean that they are guilty of the crimes charged here in this indictment."

The defendants' complaint is that this testimony, like the jury instruction addressed

10

previously, equated civil violations with guilt of the charged criminal offenses. The defendants rely on two cases from this circuit, United States v. Christo, 614 F.2d at 494-95, and United States v. Riddle, 103 F.3d 423 (5th Cir. 1997). The defendants' reliance on these cases is misplaced as they are factually distinguishable from facts in this case. In Christo, a former bank officer was charged with misapplication of bank funds. The government repeatedly attempted to introduce certain Cease and Desist Orders issued by the Controller of the Currency against the bank and was successful in bringing them up eight times before the jury. This court found that the government failed to demonstrate the relevance of these orders to the charges against the officer and that they were highly prejudicial. 612 F.2d at 494-95. In Riddle, this court found that reports of bank examiners, even if admissible, had limited relevance to the charged crimes, were overly prejudicial and should not have been admitted at trial of former chairman of bank's board charged with bank fraud and other crimes. 103 F.3d at 430-31. Riddle also addressed opinion testimony by an unqualified lay witness regarding the propriety of certain banking practices and his opinion that those practices caused the bank to fail.

The challenged testimony in this case differs from that in Christo and Riddle in several respects. First, the testimony of both Ms. Witherow and Mr. Ruud was relevant to the issue of the Herrings' intent. Ms. Witherow's testimony shows that when she confronted the Herrings with the illegality of their actions, they rejected several opportunities to correct the problem and refund the pension plans. Their stalling tactics negated a good faith defense. Mr. Ruud's testimony demonstrated the Herrings' knowledge that their transactions violated the plans and ERISA regulations and that the Herrings falsified forms to conceal the transactions. This testimony was probative on the Herrings' knowledge, bad faith and the willful nature of their

11

actions. See <u>United States v. Grote</u>, 632 F.2d 387, 390 (5th Cir. 1980) (Allowing IRS official to testify comparing defendant's tax returns characterizing some as "acceptable" and some "unacceptable" in order to show defendant's prior knowledge of what was required of him.) Second, based on our review of the record, the district court was careful to redact exhibits and streamline testimony to reduce any prejudicial effect. Finally, the district court gave appropriate and timely limiting instructions to the jury to caution them that testimony regarding charges of civil violations does not mean that the defendants are guilty of the crimes charged.

The defendants also complain about evidence that certain submitted expenses were disallowed or disallowable by Medicare. Gerald Fink, an FBI financial analyst, testified regarding the results of certain analysis he did at the direction of the government. He reviewed 1995 and 1996 credit card charges focusing on charges for travel and meals incurred by the Herrings and charged to the Agencies. He first totaled all charges for those types of expenses. Then he calculated a subset of those charges in several categories including charges for meals when a per diem allowance was claimed, charges for airfare or meals when no documentation of a business reason was in the file, charges for hotel suites and extensions of hotel stays before and after business conferences, and the difference between first class airfare and coach tickets. By his calculations, those excessive charges totaled $99,535.

Mr. Fink was not called as an expert. He summarized and analyzed record evidence of the Herrings credit card receipts and Medicare audits. Some of his calculations included amounts that had been disallowed in the Medicare audit. His calculations added items that met the same criteria as the disallowed charges but were not identified in the audit because of the random nature of the audit. Mr. Fink's analysis was significantly more extensive than the audit.

12

The Herrings objected that Mr. Fink's testimony extended beyond that of a summary witness because he was asked to draw conclusions as to costs disallowed or disallowable by Medicare. Based on our review of the record, we conclude that the district court did not abuse its discretion in admitting this testimony. After traversing the witness outside the presence of the jury, his testimony was carefully limited to presenting his summary calculations of charges that met criteria given to the witness by the government. The defense vigorously cross examined the witness and made the point that he was not an expert and that his calculations did not take into account the Medicare appeals process that could impact his conclusions.

The district court did not abuse its discretion in admitting this testimony.

B.

The Herrings argue that their convictions should be reversed because the government elicited material testimony that it knew was untrue and allowed misleading testimony to go uncorrected. This argument is predicated on the testimony of former agency employees who testified that they had lost their pensions. The defendants contend that this testimony is false because the government knew that the plans had substantial assets. The Herrings also complain of testimony about their lifestyle, including a large ring worn by Martha Herring, the furnishings of their Highland Road home and whether they made any payments on that home loan. The defendants suggest this testimony was designed to create jury resentment.

Based on our review of the trial testimony, these contentions are without merit. The government did not sponsor false, misleading or uncorrected testimony. The former employees' testimony about the solvency of their pension accounts is supported by other testimony in the record that no payments were being made from the fund to the beneficiaries. Testimony regarding

13

the Herrings' lifestyle was very limited and relevant to illustrate how the Herrings personally benefitted from the funds the government charged was misappropriated from Medicare and the pension funds. Whether any payments were actually made towards the Highland Road home loan was an area of factual dispute at the trial. None of this disputed testimony establishes a basis for a due process violation.

IV.

Next, the Herrings challenge the sufficiency of the evidence supporting their convictions for bankruptcy fraud. A party who acts in good faith reliance on the advice of an attorney does not have the fraudulent intent necessary to support a conviction for bankruptcy fraud. United States v. West, 22 F.3d 586, 598 n.34 (5th Cir. 1994).

Ms. Herring was charged with bankruptcy fraud relating to her transfer of property she owned in Pass Christian, Mississippi to an LLC for the benefit of her son and daughter before she filed her Chapter 7 petition. In order to demonstrate bankruptcy fraud, the government must show that she knowingly and fraudulently transferred property in contemplation of bankruptcy. 18 U.S.C. § 152(7). According to the government, the transfer was made within one year of Ms. Herring's filing for bankruptcy and not listed in her bankruptcy filings. Although Ms. Herring submits that she relied upon the advice of counsel in setting up the transfer, she did not call any of them as witnesses and her own testimony establishes that she made the transfer to protect her property from bankruptcy. Her son, one of the transferees, had no knowledge of the transaction. This evidence is sufficient to support her conviction of bankruptcy fraud.

The Herrings' convictions for bankruptcy fraud on behalf of their corporation was based on testimony that they omitted two assets from their bankruptcy schedules - (1) a hospice license

14

which was disclosed when the Herrings sought permission to sell it in the proceedings for $10,000, and (2) accounts receivable for monies owed by Goldco, the Goose, or the Herrings to the Agencies. They argue that the omission of these assets failed to establish the requisite intent to defraud creditors as is required to support a conviction, citing In re Humphries, 469 F.2d 643, 644 (5th Cir. 1972). They argue further that they relied on their accountant and bankruptcy attorney to ensure that the assets of the Agencies were properly disclosed. Again the Herrings failed to call either the accountant or the bankruptcy attorney at trial. Testimony from several witnesses at trial demonstrated that the Herrings were in sole joint control of all business decisions affecting the Agencies and as well as Goldco and the Goose. They affirmed under oath their obligation to disclose all assets and to correct any errors or omissions in the bankruptcy proceedings. This issue is without merit.

V.

Finally, the Herrings argue that the district court misapplied the Sentencing Guidelines by overstating the amount of loss and the corresponding offense level. A determination of the loss for calculating the applicable guideline range is a legal question reviewed *de novo*. United States v. Izydore, 167 F.3d 213, 223 (5th Cir. 1999). Factual determinations regarding losses are reviewed for clear error. United States v. Bieganowski, 313 F.3d 264, 294 (5th Cir. 2002). The government calculated the loss based on the harm inflicted on the victims of the fraud, i.e. the pension plans and Medicare. In a case involving diversion of government program benefits, loss is the value of the benefits diverted from intended recipients or uses. U.S.S.G. 2F1.1 Comment 8(d) (2000).

Applying that comment, the district court found a total loss of $7,324,266. The Herrings

15

suggest that the loss calculation should be offset by the value of the property securing the loans from the pension plans, which they estimate at $1.5 million and the value of the Golden Goose preferred stock, which they set at $500,000. The district court relied instead on the valuations set by the plan fiduciary who unequivocally valued all collateral at zero. This is a credibility call that is within the discretion of the district court and based on credible evidence in the record. It is not clearly erroneous. The Herrings will receive the benefit of any recovery on these assets as offsets to their restitution obligation.

The Herrings also contend that the loss should not include the following items:

a.      $212,236 in interest.

The Herrings argue that the loss calculation should not include interest on the unpaid 1995 and 1996 contributions to the pension plans. Their position is based on the assumption that the interest in the loss calculation is "opportunity cost" interest that the plan could have earned on the funds had they been timely deposited, which, they submit, the guidelines do not allow to be included in the loss. The government counters that the interest included in the loss calculation instead reflects interest that the Herrings fraudulently included on their Medicare cost reports. The Herrings received reimbursement for this claimed expense, which was disallowed and now cannot be recovered from the Agencies. This fraud was alleged in the indictment. Accordingly, because most of the Herrings' argument on this point is based on their incorrect assumption, their authorities are inapplicable. The district court properly included this loss in the calculation of amounts diverted from the Medicare program.

b.      $1.2 million disallowed charge for paid days off in 1995 and 1996.

The loss calculation also includes over $1 million representing paid days off for staff

16

claimed in the 1995 and 1996 cost reports. These claims were disallowed as being claimed too early. The government justifies their inclusion in the loss calculation because Medicare has no mechanism for collecting these amounts. Accordingly, like the interest improperly claimed, this amount should be included in the loss calculation because it was diverted from the Medicare program.

        c.      $105,000 in disallowed or disallowable travel expenses.

The final challenge to the loss calculation involves the inclusion of excess and unallowable travel reimbursements. The defendants characterize these as simple disallowances which did not result in a loss. However, the Agencies received the funds claimed for these travel expenses and there is no evidence that these monies were repaid or recouped by Medicare. Given our conclusion as to the Herrings' other challenges to the loss calculation, even if this amount were removed from the loss calculation it would not impact their sentences as it would not lower the loss to an amount below $5,000,000. U.S.S.G. 2F1.1(b).

For reasons stated above, the district court did not err in its calculation of the loss for sentencing purposes.

IV.

In summary, we find no error in the convictions or sentences of the Herrings as found by the district court. The judgment of the district court is therefore AFFIRMED.

17