**UNITED STATES of America**

v.

**John HEVENER, Jr.**

**No. CRIM.A.04–0298.**

United States District Court, E.D. Pennsylvania.

June 20, 2005.

Kristin R. Hayes, Michael J. Bresnick, U.S. Attorney's Office, Philadelphia, PA, for Plaintiff.

Kenneth C. Edelin, Jr., Federal Defenders, Leigh Michael Skipper, Defender Association of Philadelphia, Philadelphia, PA, for Defendant.

## MEMORANDUM

ROBRENO, District Judge.

## I. BACKGROUND

On May 26, 2004, a federal grand jury indicted John Hevener, Jr. ("Defendant") on two counts of mail fraud, in violation of 18 U.S.C. § 1341 (doc. nos. 1 and 34).[1] According to the indictment, Defendant engaged in a scheme to defraud by obtaining money and property through means of false and fraudulent pretenses, representations, and promises. For this scheme, Defendant, a self-employed public account-ant,[2] convinced some of his accounting clients and their relatives (the "clients" or the "victims")—Edward and Ida Ream (the "Reams"), Polly and Edward Haldeman (the "Haldemans"), Gregory and Gladys Stauffer (the "Stauffers"), and Betty and Kenneth Sheetz (the "Sheetzes")—to invest money with him by falsely promising high rates of return and a secure principal. Through the use of corporate entities that he controlled or owned,[3] Defendant disguised his purpose for collecting money from these clients. In total, the clients gave Defendant $753,000. To minimize the victims' suspicions, Defendant used money given to him from certain victims to pay other victims "quarterly interest payments." Defendant also informed the victims, either by mailing them promissory notes or by contacting them on the telephone, that they had earned interest on their investments, when in fact they had not. In furtherance of his scheme, Defendant mailed Internal Revenue Service Forms 1099 (Interest Income) to the victims, falsely representing their earned interest income on their investments.

The grand jury charged Defendant with two counts of mail fraud. These counts were predicated on two letters that Defendant knowingly mailed or caused to be delivered by mail: (1) a letter to the Reams, dated August 25, 1999, and (2) a letter to the Stauffers, dated June 13, 2000.

---

1. The original indictment was filed on May 26, 2004 (doc. no. 1), and a superseding indictment was filed on February 23, 2005 (doc. no. 34). The only difference between the original indictment and the superseding indictment is the description of the Count One mailing. In the original indictment, the Count One mailing was described as a "[l]etter transmitting IRS Form 1099 falsely representing interest earned in 1998 of $5,768.84." Indictment ¶ 38. In the superseding indictment, the Count One mailing is described as a "[l]etter responding to [a] request for repay-ment of loan." Superseding Indictment ¶ 38. The Court will use the term "indictment" to refer to the superseding indictment.

2. Defendant is not a certified public accountant.

3. These entities included United Equity & Leasing Corporation and Fujibanc, N.A., which Defendant claimed was a bank, but in fact was a Panamanian corporation that Defendant acquired.

After a five-day trial, the jury returned a guilty verdict against Defendant on both counts.[4] At a hearing on May 24, 2005, the Court considered Defendant's post-trial motion for judgment of acquittal or, in the alternative, a new trial (doc. nos. 47 (original) and 54 (supplemental)). The motion was denied from the bench, and an Order soon followed (doc. no. 64). This memorandum sets forth the basis of the Court's decision.

## II. DISCUSSION

### A. *Motion for Judgment of Acquittal*

Pursuant to Federal Rule of Criminal Procedure 29, Defendant moves for judgment of acquittal on both charged counts, challenging the sufficiency of the evidence produced by the Government at trial. More specifically, Defendant contends that no reasonable jury could have concluded that: (1) Defendant possessed the specific intent to defraud, or (2) the actual mailings furthered the alleged scheme to defraud. These contentions are without merit.

As Rule 29 provides, "[a] defendant may move for a judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets during the 7–day period." Fed.R.Crim.P. 29(c)(1). When considering a post-trial motion for judgment of acquittal, the district court "must review the evidence in light most favorable to the verdict, and must presume that the jury has properly carried out its functions of evaluating credibility of witnesses, finding the facts, and drawing justifiable inferences." *United States v. Coleman*, 811 F.2d 804, 807 (3d Cir.1987) (quoting *United States v. Campbell*, 702 F.2d 262, 264

(D.C.Cir.1983)); *see also United States v. Brodie*, 403 F.3d 123, 133 (3d Cir.2005); *United States v. Hart*, 273 F.3d 363, 371 (3d Cir.2001); *United States v. Aguilar*, 843 F.2d 155, 157 (3d Cir.1988); *United States v. Hinton*, No.Crim. A. 02–769, 2003 WL 22429048, at *1 (E.D.Pa. Sept. 18, 2003) (Robreno, J.). "A verdict will be overruled only if no reasonable juror could accept the evidence as sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt." *Coleman*, 811 F.2d at 807 (quoting *Campbell*, 702 F.2d at 264).

"Courts must be ever vigilant in the context of Fed.R.Crim.P. 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *Brodie*, 403 F.3d at 133; *see also Aguilar*, 843 F.2d at 157 ("It is not for [the reviewing court] to weigh the evidence or to determine the credibility of witnesses."). The reviewing court must be "highly deferential" to the jury's verdict. *Hinton*, 2003 WL 22429048, at *1 (citing *Hart*, 273 F.3d at 367). In fact, "[a] finding of insufficiency should be confined to cases where the prosecution's failure is clear." *Brodie*, 403 F.3d at 133 (citation and internal quotation marks omitted).

With these guiding principles in mind, the Court will address the two arguments that Defendant asserts in his motion for judgment of acquittal.

1. *Did the evidence presented at trial fail to establish Defendant's intent to defraud?*

██ Defendant argues that the evidence presented at trial failed to show that he

---

**4.** At the close of the Government's case, defense counsel moved for judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29. The Court denied the motion. Defense counsel renewed the motion for judg-

ment of acquittal after the defense rested, but the Court ruled that the case would go to the jury. The jury convicted Defendant on both counts of mail fraud.

had any intent to defraud his investors, but instead proved the opposite. At trial, the victims testified to knowing that Defendant planned to invest their money in former Soviet Union countries. The investments were for ventures involving, *inter alia*, oil shipments, sawmills, and medical supplies. Defendant argues that the victims' money was invested in this purported manner, which is evidenced by defense witness Lloyd Hearst and an oil shipment invoice. Mr. Hearst, a business partner of Defendant, testified about some investment opportunities in Latvia, which ultimately were unprofitable. Defendant also points to the oil shipment invoice that the Government offered into evidence. Certain victims were told that their money was being invested in oil, and Defendant asserts that the shipping invoice proves that this investment was made. Finally, Defendant argues that his extensive accounting records show that he did, indeed, invest the victims' money.

Thus, Defendant surmises that Mr. Hearst's testimony and the oil shipment invoice, along with the extensive accounting records kept by Defendant, illustrate that he was legitimately investing money in overseas business opportunities. Based on all of this evidence, Defendant contends that no reasonable juror could have inferred that Defendant intended to perpetrate a fraud on investors. Additionally, Defendant argues that no reasonable juror could have believed that a person who was intending to defraud investors would keep detailed accounting records of investments.

 Defendant's arguments are unavailing. "To support a conviction for mail fraud the Government's evidence must show that the defendant agreed to participate in a scheme to defraud and that he caused the mails to be used in furtherance of the scheme." *United States v. Sturm*, 671 F.2d 749, 751 (3d Cir.1982); *see also United States v. Pharis*, 298 F.3d 228,

233–34 (3d Cir.2002) (stating that the elements of mail-fraud under 18 U.S.C. § 1341 are: "(1) a scheme to defraud; (2) use of the mails to further that scheme; and (3) fraudulent intent."). "The necessary intent may be shown by evidence that the defendant[ ] devised the fraudulent scheme or participated in it with knowledge of its fraudulent nature." *Sturm*, 671 F.2d at 751 (citing *United States v. Pearlstein*, 576 F.2d 531, 537 (3d Cir.1978)) (ellipses omitted).

The evidence in this case supports the jury's finding that Defendant acted with the requisite intent. The Government introduced evidence to show how Defendant explained the nature and status of investments to the victims and the Pennsylvania Securities Commission. The Government also submitted Defendant's financial statements and records depicting investment activities that were inconsistent with statements he made to the victims and the Pennsylvania Securities Commission. Although the defense offered certain evidence showing that Defendant did invest *some* money in a way in which he purported, the Government introduced evidence showing that not *all* of the victims' investment money was being used in the matter in which they believed. Weighing this evidence, the jury could have reasonably determined that Defendant acted with intent to defraud. In a light most favorable to the verdict, the jury could have found proof beyond a reasonable doubt that Defendant had the requisite intent.

2. *Did the evidence presented at trial fail to show that the two mailings were in furtherance of a scheme to defraud?*

██ Defendant disputes that the two mailings at issue in the case furthered a scheme to defraud. While the Government contends that the mailings were used

to "lull" the victims into believing that their money was lost in legitimate business ventures, Defendant argues that the letters were sent after any alleged fraud occurred and therefore cannot be part of the scheme. At the end of the Government's case, Defendant raised this argument in his first Rule 29 motion (Tr. 03/03/2005, Vol. II, at 4–11). The Court discounted Defendant's argument and denied the motion (Tr. 03/03/2005, Vol. II, at 11).

Both mailings at issue were made in response to inquiries by the victims concerning their investments. In the first mailing, a letter dated August 25, 1999, Defendant informed the Reams that no payment (presumably an interest payment) would be made on their loan to United Equity & Leasing Corporation, Defendant's company. Among other things, Defendant indicated in the mailing that the Reams's loan was "non-performing." In the second mailing, dated June 13, 2000, Defendant informed the Stauffers that he had been living in Washington, D.C. for over a year and provided them with his new address. Additionally, Defendant indicated that his Washington attorney would be contacting them.

Defendant argues that these letters cannot be categorized as "lulling" letters. Because Defendant's letter to the Reams (i.e., the first mailing) made no promises of a future return, Defendant contends that the letter cannot be considered a "lulling" letter since it was not designed to provide the Reams with a false sense of security. Defendant rationalizes that because the letter to the Reams "clearly expressed" no hope for recovery of their investment, any scheme to defraud could not be, in a sense, "furthered." Similarly, according to Defendant, when the Stauffers received his June 13, 2000 letter (i.e., the second mailing), they already knew their investment was not recoverable. Thus, even if a scheme to defraud existed, Defendant asserts that both mailings would have been "after the fact," and therefore not in furtherance of the fraud.

Defendant's argument is tenuous. The scheme in the instant case is not limited to, or necessarily constrained by, the two mailings. As the Supreme Court stated, "[u]nder the [mail fraud] statute, the mailing must be for the purpose of executing the scheme, as the statute requires, but it is not necessary that the scheme contemplate the use of the mails as an essential element." *United States v. Maze*, 414 U.S. 395, 400, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974) (citations and internal quotation marks omitted). In *United States v. Pharis*, 298 F.3d 228 (3d Cir.2002), the Third Circuit noted that "[i]n interpreting the federal mail-fraud statute, the Supreme Court has long held that it is not necessary that the scheme contemplate the use of the mails as an essential element. All that is required is that the defendants knowingly participated in a scheme to defraud and caused a mailing to be used in furtherance of a scheme." *Id.* at 234 (citations and internal quotation marks omitted); *see also United States v. Shively*, 927 F.2d 804, 814 (5th Cir.1991) ("While § 1341 requires a use of the mails for the purpose of executing the scheme, the statute does not require that the material mailed be fraudulent itself. Mailings designed to 'lull' the victim into a false sense of security, or to postpone inquiries or complaints, or to make the transaction less suspect are mailings in furtherance of the fraudulent scheme. The relevant inquiry is whether the mailings were 'sufficiently closely related' to the fraudulent scheme to bring it within the scope of § 1341.") (citations omitted).

Although the victims' money may have already been lost by the time the two letters were sent, Defendant used these

mailings to cover up his fraudulent scheme. Defendant sent the letters to the victims to conceal how the victims' money was actually lost. Thus, the mailings were sufficiently related to the fraudulent scheme, i.e., they were not incidental to the scheme, but a necessary part of it.[5]

### B. *Motion for New Trial*

Defendant moves, in the alternative, for a new trial under Federal Rule of Criminal Procedure 33. Rule 33 allows a court, upon motion of a defendant, to "grant a new trial to that defendant if required in the interest of justice." Fed.R.Crim.P. 33. "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Johnson,* 302 F.3d 139, 150 (3d Cir.2002) (citations and internal quotation marks omitted). "Unlike an insufficiency of the evidence claim, when a district court evaluates a Rule 33 motion it does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Id.* (citations omitted).

The Court will address, in turn, Defendant's three arguments in support of his motion for a new trial.

1. *Did the Government's remarks during opening statement, closing argument, and/or rebuttal shift the burden of proof and/or challenge Defendant's failure to testify?*

■ Defendant contends that the Government made improper statements—during its opening statement, closing argument, and rebuttal—about Defendant's failure to testify and to explain certain evidence, and that these statements inappropriately shifted the burden of proof to the Defendant. The Government disputes these contentions, arguing that the prosecutor properly emphasized the significance of Defendant's false exculpatory statements to the victims and the Pennsylvania Securities Commission, and highlighted the self-serving nature of Defendant's statements. Moreover, the Government states that it properly focused on deficiencies in the Defendant's case, and that the burden of proof remained with the Government.

It is well established that "the prosecution may not comment on a defendant's failure to testify and may not improperly suggest that the defendant has the burden

---

**5.** Defendant's reliance on *United States v. Maze,* 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974), is misplaced. In that case, defendant stole a credit card and used the card to obtain food and lodging at various motels. The Government charged the defendant, in part, under the mail fraud statute, asserting that the sales invoices from the transactions on the stolen card, which were forwarded from the motels to the "credit card bank," constituted a "mailing." The Supreme Court disagreed, finding:

> [T]he mailings here were directed to the end of adjusting accounts between the motel proprietor, the Louisville bank, and [the owner of the stolen card], all of whom had to a greater or lesser degree been the vic-

tims of [defendant's] scheme. [Defendant's] scheme reached fruition when he checked out of the motel, and there is no indication that the success of his scheme depended in any way on which of his victims ultimately bore the loss. Indeed, from his point of view, he probably would have preferred to have the invoices misplaced by the various motel personnel and never mailed at all.

*Id.* at 402, 94 S.Ct. 645.

Unlike the defendant in *Maze,* Mr. Hevener mailed the letters to his victims to cover up what actually happened to their investments. The mailings were not incidental to the scheme, but was a necessary part of the scheme.

to produce evidence." *United States v. Balter*, 91 F.3d 427, 441 (3d Cir.1996); *see also Griffin v. California*, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965) (finding that the Fifth Amendment's Self-Incrimination Clause bars a prosecutor from commenting to the jury on a defendant's failure to testify); *Lesko v. Lehman*, 925 F.2d 1527, 1544 (3d Cir.1991) ("Our well-established test for determining whether a prosecutor's remark violates *Griffin* is whether the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify."). "In deciding whether the prosecution has improperly commented at trial, the court should look to the overall context of the statements in the trial record." *United States v. Mastrangelo*, 172 F.3d 288, 297 (3d Cir.1999).

■ A prosecutor is permitted, however, to comment on the failure of defense counsel to point to evidence in the record that supports the defense's theory of the case. *Balter*, 91 F.3d at 441. "Such a comment does not implicate any of the burden-shifting concerns that are raised when a prosecutor points to a defendant's failure to testify or improperly suggests that the defendant has the burden of producing evidence." *Id.*

If a court concludes that a prosecutor's comment was improper, then a harmless error analysis must be applied. *Mastrangelo*, 172 F.3d at 297. A court must determine if "it is *highly probable* that the error did not contribute to the judgment." *Id.* (emphasis in original) (citation and internal quotation marks omitted). "The high probability standard is met when the court possesses a 'sure conviction' that the error did not prejudice a defendant." *Id.* (citation omitted). Courts have "looked to three factors to determine whether there was prejudice: [1] the scope of the improper comments in the overall trial context, [2] the effect of any curative instructions given, and [3] the strength of the evidence against the defendant." *Id.*

Although Defendant submits that the Court must review the entire record to appreciate the substantial prejudice, Defendant focuses on certain remarks made by the prosecutor during her opening statement, closing argument, and rebuttal. For example, Defendant contends that the following comments made by the prosecutor in her opening statement were inappropriate:

At some point the Pennsylvania Securities and Exchange Commission becomes involved. Victims start complaining to them. And you will hear that they ask Mr. Hevener to explain what happened to this money. And he couldn't explain what happened to it. Part of the evidence in this case about why these are not simply investments that went bad is that Mr. Hevener has never been able to explain to anyone who's asked, not any of the victims in this case nor the Pennsylvania Securities Commission what happened here. And the Government submits to you that the evidence will show that had these been legitimate investments that went bad, he would have been able to give the people who had invested an accounting of what happened to the money, but he couldn't.

(Tr. 03/01/2005 at 19–20). At the close of the Government's opening statement, defense counsel objected to these and other remarks at sidebar, arguing that the burden of proof had been improperly shifted to the Defendant. More specifically, defense counsel contended that by mentioning Defendant's failure to explain to either the victims or the Pennsylvania Securities Commission what happened to the investments, the Government suggested to the jury that Defendant must offer such an

explanation. The Court suggested, and the parties agreed, that a limiting instruction should be given to the jury after the close of opening statements, stating that the Government carried the burden of proof and that the Defendant was under no obligation to testify or to put on evidence at trial (Tr. 03/01/2005 at 20–22). At the close of defense counsel's opening statement, the Court gave such an instruction (Tr. 03/01/2005 at 25–26).

Next, Defendant focuses on two comments made by the prosecutor in her closing argument. First, the prosecutor stated: "Does [Defendant] in any way, shape or form ... give you what any normal human being would regard as an explanation[?]" (Tr. 03/04/2005 at 42). Second, the prosecutor remarked: "No explanation, no documentation, and ladies and gentlemen, again, look at what John Hevener says after the money comes in." (Tr. 03/04/2005 at 27). When viewed alone, both of these comments could be construed as shifting the burden to Defendant. The prosecutor, however, made these remarks in the context of discussing the explanations that Defendant gave to the victims about their lost investments.

To put the first remark in its proper context, the Court will reiterate what the prosecutor stated prior to the remark at issue:

And then, what happens when Ed and Polly start asking the tough questions. You know, Betty starts complaining to Polly about Fuji Bank [sic], and they who have trusted him, just like Greg and Gladys do all these years, they start getting worried, and they start asking questions. You look at what he says back to them. *Does he in any way, shape or form in government exhibit 66 and 67, the letter to them about what happened to their money, does he give you what any normal human being would regard as an explanation [?]*

(Tr. 03/04/2005 at 41–42) (emphasis added).

As for the second remark, the prosecutor made it when discussing Defendant's oil investment. To put this remark in context, the prosecutor said:

And again, when you look at the $80,000 coming in to Fuji Bank [sic], yeah, there's a check out that appears to be in payment of the purchase of that oil, but where does the rest of that money go? It goes to Innervision Ministry, $15,000, and it goes to TIB Commodities Exchange of America, $25,000. *No explanation, no documentation, and ladies and gentlemen, again, look at what John Hevener says after the money comes in.* Polly Haldeman testified that she and her husband, Ed Haldeman, talked to John Hevener regularly. By the time they were giving him money in 1994, they had known him, I think she said he started doing their taxes back in the early 80's, and I might be a little off on the dates, but it's a long time. Did he tell them anything back then that there was any problem with this oil? No. He just put them off and put them off and put them off and put them off.

(Tr. 03/04/2005 at 27) (emphasis added).

Finally, Defendant objects to a remark made by the prosecutor during rebuttal: "Show me the money. That's the question for you. John Hevener couldn't show the victims when he did it and he couldn't show the Pennsylvania Securities Exchange Commission. When he put a case on in this courtroom he didn't show you." (Tr. 03/04/2005 at 62). A defense objection quickly followed this remark. The Court *immediately* sustained the objection and reminded the jury that the Government carried the burden of proof.

After the Government's rebuttal, defense counsel moved for a mistrial, assert-

ing that the Government improperly shifted the burden of proof. In denying the motion for a mistrial, the Court noted that (1) it was not clear that the prosecutor's comments were objectionable at all since they were a "fair reply" to defense counsel's theory of the case, and (2) if there was a suggestion of a burden shift, it had been cured by the Court's immediate and complete instruction to the jury about the Government's burden and by the Court's sustaining of the defense's objection (Tr. 03–04–2005 at 66).[6]

Viewed in the context of the entire trial, the prosecutor's remarks in opening, closing, and rebuttal were not improper. Government counsel remarked about Defendant's failure to explain the status of the investments to the victims and the Pennsylvania Securities Commission. These remarks, however, were meant to focus on Defendant's exculpatory statements. Government counsel stressed the significance of how Defendant's financial documents and records did not support Defendant's statements (to the victims and the Pennsylvania Securities Commission) regarding what happened to the victims' money.

Even assuming the remarks were improper and the impropriety was not remedied by the Court's prompt curative instructions, the remarks were not prejudicial. *Mastrangelo*, 172 F.3d at 297 (acknowledging that courts must look to three factors to determine whether an improper comment was prejudicial: "[1] the scope of the improper comments in the overall trial context, [2] the effect of any curative instructions given, and [3] the strength of the evidence against the defendant."). The remarks were made during the Government's opening statement, closing arguments, and rebuttal. At the close of opening statements and during the Government's rebuttal, the Court cured any potential problems by reminding the jury that the Government carried the burden of proof. Moreover, the evidence offered at trial strongly supported a scheme to defraud, especially in light of Defendant's financial records and Defendant's statements to the victims and the Pennsylvania Securities Commission. The Government's attempt to focus the jury's attention on holes in the defense's theory of the case was not improper. *See Balter*, 91 F.3d at 441. Accordingly, the Court does not agree with Defendant's interpretation of certain remarks made by the prosecutor.

2. *Did Dennis Zawacki, a Government witness, improperly testify as an expert?*

■■ Defendant renews his trial objection that Dennis Zawacki, a Government witness, improperly testified as an expert. The Government disputes these contentions, arguing that Mr. Zawacki testified as a summary witness, pursuant to Federal Rule of Evidence 1006. Rule 1006 provides:

> The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at reasonable time and place. The court may order that they be produced in court.

Fed.R.Evid. 1006. "It is well established that summary evidence is admissible under

---

**6.** During the Government's closing statement, the prosecutor stated: "This is a criminal case, and it's our burden of proof, to prove this all to you beyond a reasonable doubt, and that means the defendant doesn't have to put a case on in any way, shape or form, but if the defendant does put a case on through his counsel[, it] is fair game for the government to comment on it on [sic] their witnesses." (Tr. 03/04/2005 at 25–26).

Rule 1006 only if the underlying materials upon which the summary is based are admissible." *United States v. Pelullo,* 964 F.2d 193, 204 (3d Cir.1992) (citations omitted). The purpose of the rule is to "provide a practicable means of summarizing voluminous information." 6 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence,* § 1006.02 (2d ed.1997).

Defendant identifies certain areas of Mr. Zawacki's testimony that should be classified as expert testimony, including statements of his background, comments concerning accounting and financial statements, and remarks about missing financial documents in Defendant's records.[7] As such, Defendant contends that this testimony "ultimately led to the implication that the records failed to conform with accepted recording practices, the implication of which suggested wrongdoing." Def.'s Post–Trial Mot. at 12. Additionally, Defendant argues that a layperson could not have produced the charts and summaries that Mr. Zawacki created from Defendant's records.

Defendant relies on the Fifth Circuit case of *United States v. Hart,* 295 F.3d 451 (5th Cir.2002) to support his arguments. In *Hart,* the defendant was charged with knowingly making false statements on applications for farm loans and bribing officials of the Farm Service Agency (FSA). *Id.* at 455. An important aspect of the farm loans involved Farm and Home Plans (FHPs), which are computer-generated projections reflecting the borrower's plan of operation. *Id.* at 453. At trial, the Government offered the testimony of an FSA employee, who had prepared *revised* FHPs to illustrate "what the result would have been if all the debts testified to by the government's witnesses had been included on the [defendant's] actual FHPs." *Id.* at 455. The Fifth Circuit found such testimony to be expert testimony, as opposed to summary witness testimony, reasoning that "the proper preparation of the FHP is anything but a simple and straightforward exercise." *Id.* at 456. Moreover, the Fifth Circuit concluded that "the total absence of any independent testimony to support [the FSA employee's] assumptions in preparing the FHPs becomes palpable. In short, it is apparent to us that [the FSA employee] functioned as the government's sole expert witness regarding the proper preparation of (1) the FHPs generally, and (2) the [defendant's] FHPs in particular, thereby unquestionably exceeding the scope of FRE 1006." *Id.* The Fifth Circuit also emphasized the complexity of the FHP preparation pro-

---

7. Defendant specifically objects to six statements made by Mr. Zawacki. First, Mr. Zawacki testified to his credentials, such as his being a certified fraud examiner, and his experience. (Tr. 03/03/2005, Vol. I, at 15–18). Second, Mr. Zawacki testified that "[b]usinesses usually have a general ledger and then various things that [sic] tie into the general ledger, for example, cash receipts, cash disbursements. They'll have journal entries." (Tr. 03/03/2005, Vol. I, at 18). Third, Mr. Zawacki stated that "[a] general ledger is a recording of all the transactions, usually in a given period of time, like a year. Records by various accounts and the accounts are grouped by type of account, like an asset account, liability account, an equity account, or an expense account." (Tr. 03/03/2005,

Vol. I, at 23). Fourth, Mr. Zawacki testified as to what records a business should maintain, stating "[t]hey maintain, you know, source documents, bank statements, tax returns, source documentation invoices, purchase orders, requisitions, delivery orders, inventory types of records, depending on the type of business." (Tr. 03/03/2005, Vol. I, at 23). Fifth, Mr. Zawacki testified as to what documents were not found in Defendant's financial records (Tr. 03/03/2005, Vol. I, at 42–51). Sixth, Mr. Zawacki commented about Defendant's financial statements, specifically that "[t]hese schedules were prepared kind of like a positive/negative type situation instead of debit and credit which can be kind of confusing." (Tr. 03/03/2005, Vol. I, at 58).

cess and the potential for jury confusion. *Id.* at 456–57.

Unlike the witness in *Hart,* however, Mr. Zawacki created charts and summaries based on Defendant's financial statements and records. Mr. Zawacki did not presume or predict information.

Another Fifth Circuit case appears to be more analogous to the instant case. In *United States v. Herring,* 72 Fed.Appx. 57 (5th Cir.2003), an FBI financial analyst was called as a summary witness in a health care and bankruptcy fraud case. *Id.* at 64. The analyst testified about the results of certain analyses he made at the direction of the Government. *Id.* He reviewed credit card charges, totaled the charges, and calculated a subset of those charges. *Id.* In part, the analyst testified as to what costs were disallowed under Medicare. *Id.* The Fifth Circuit found that the district court did not abuse its discretion by admitting the analyst's testimony, determining that the analyst's "testimony was carefully limited to presenting his summary calculations of charges that met criteria given to the witness by the government. The defense vigorously cross examined the witness and made the point that he was not an expert and that his calculations did not take into account the Medicare appeals process that could impact his conclusions." *Id.*

Moreover, many courts have found that "the nature of a summary witness's testimony requires that he [or she] draw conclusions based upon the evidence presented at trial." *United States v. Radseck,* 718 F.2d 233, 239 (7th Cir.1983) (quoting *United States v. Esser,* 520 F.2d 213, 218 (7th Cir.1975)); *see also United States v. Jennings,* 724 F.2d 436, 442 (5th Cir.1984) ("The government's summary witness explained in some detail how he had derived figures contained in the summary charts from the underlying documents. Although certain of the conclusions in the summary

charts are undoubtedly the product of assumptions made by the government, these assumptions are not *per se* impermissible.... [S]uch assumptions are allowed so long as supporting evidence has been presented previously to the jury ... and where the court has made it clear that the ultimate decision should be made by the jury as to what weight should be given to the evidence.") (emphasis in original) (citation and internal quotation marks omitted); *United States v. Stone,* 222 F.R.D. 334, 337 (E.D.Tenn.2004) ("While a summary witness may not give a legal opinion that determines guilt or that instructs the jury on controlling legal principles, a summary witness may give her opinion that tax liability would arise under certain circumstances and may opine whether particular payments would be taxable.").

As this Court stated from the bench when denying defense counsel's motion to strike Mr. Zawacki's testimony or motion for mistrial,

Mr. Zawacki was called as a summary witness to explain the content of charts based on voluminous testimony. The charts were provided to the defendant prior to trial. All of the documents underlying the charts provided were also provided to the defendants—to the defendant prior to trial. The charts were based upon the defendant's own documents, and they included general ledgers, journal entries, checkbooks and the like concerning the operation of the defendant's various financial entities and between and among them.

No testimony was offered as to whether the transactions were fraudulent or evidence inten[t] to defraud, or were consist[ent] with conduct evidencing intent to defraud, or whether they intended to conceal any fraud.

The fact that the witness was introduced to the jury as having been certified as a fraud investigator does not place the testimony of the witness into that of opinion testimony subject to the strictures of Rule 702 or even 701, and the instructions that have been drafted and will be given to the jury [e]nsures that the witness is not treated as such. As I indicated to counsel, the record in the case indicates that the witness was not cross-examined to any extent on any of the factual bas[e]s of the testimony. The testimony is largely uncontested, and the issue will be one as to what the jury will make out of that testimony, but not the testimony itself.

(Tr. at 03/04/2005 at 9–11).

Moreover, in closing argument, defense counsel discussed the nature of Mr. Zawacki's testimony:

I mean the expert or the witness the government called didn't offer any opinion. The guy who reviewed the chart, the person who is employed by the government to review that—I forgot the gentlem[a]n's name—he didn't opine that I found indiscrepancies [sic] or fraud or anything along those lines. He prepared some charts and he told you the summaries based on the data that he had. Sometimes he had supporting documentation, sometimes he didn't. But guess what? I asked him, I said, "Well how far back do[ ] some of these charts and these records go?" Remember it was something—1988, 1990, through the early '90's.

(Tr. 03/04/2005 at 59).

Additionally, the Court gave clear instructions to the jury concerning Mr. Zawacki and his testimony. First, the Court instructed the jury about the charts and summaries created by Mr. Zawacki:

Now in this case, charts and summaries were shown to you in order to make the other evidence more meaningful and to aid you in considering the evidence. These charts and summaries are no better than the testimony and the documents on which they are based and are not themselves independent evidence. Therefore, you are to give no greater consideration to the schedules and summaries th[a]n you would give to the evidence upon which they are based.

(Tr. 03/04/2005 at 75–76). Second, the Court instructed the jury about the type of witness Mr. Zawacki was:

You may recall that a witness by the name of Mr. Zawacki testified as to certain funds—as to how certain funds went in and out of various bank accounts and as to the transactions between and among certain financial entities. Mr. Zawacki prepared certain charts and summaries that purported to summarize the document evidence of the transaction. Mr. Zawacki was not called as an expert witness. He did not offer any opinions such as to whether fraud was committed in this case or whether there was a scheme to defraud or to conceal fraud. His testimony is not independent evidence.

(Tr. 03/04/2005 at 79–80).

Essentially, defense counsel accepted the testimony of Mr. Zawacki. Moreover, the Court's jury instructions, coupled with defense counsel's comments about Mr. Zawacki during closing statement, adequately informed the jury of the nature of Mr. Zawacki's testimony. Accordingly, Defendant's challenge of Mr. Zawacki's testimony—that is, whether Mr. Zawacki testified as a summary witness or an expert witness—is not persuasive.

3. *Was the testimony of William Fleming, a former investigator with the Pennsylvania Securities Commission, improper?*

■ The Government offered the testimony of William Fleming, a former investi-

gator with the Pennsylvania Securities Commission. According to Mr. Fleming's testimony, the Pennsylvania Securities Commission received a complaint about Defendant's selling of securities. Thereafter, the Commission initiated an inquiry into this alleged activity. Mr. Fleming, who had been assigned to handle this inquiry, sent a standard form letter to Defendant, requesting certain investment information. Defendant faxed Mr. Fleming three responses, which the Government offered into evidence.

Prior to Mr. Fleming taking the witness stand, defense counsel objected to his proposed testimony, specifically that the testimony would create "the prejudicial effect of another investigative agency being involved in this matter." (Tr. 03/01/2005 at 136). The Government, however, contended that Defendant's responses were false exculpatories, being offered to show Defendant's consciousness of guilt. The Court agreed with the Government, and Mr. Fleming was permitted to testify.

Defendant renews his objection concerning Mr. Fleming's testimony. Specifically, Defendant argues that "[t]he very suggestion of the commencement of a state law enforcement agency investigation further prejudices the jury by implying that there was legitimacy to the allegations. The introduction of this testimony further suggested there were state law securities violations, a reoccurring uncharged and unsubstantiated theme throughout trial." Def.'s Post–Trial Mot. at 14. Some of the testimony that created such an inference included Mr. Fleming's statements that the Pennsylvania Securities Commission regulates the sale of securities in Pennsylvania and that his job was to conduct investigations into possible violations of the Pennsylvania Securities Act. Moreover,

Defendant contends, in a cursory manner, that this type of testimony amounted to the introduction of "other bad acts" character evidence.

Defendant's challenge is without merit. On direct, Mr. Fleming stated that after he received Defendant's responses, the Pennsylvania Securities Commission "basically terminated" its investigation and turned over any information to the Federal Bureau of Investigation. During cross examination, Mr. Fleming testified that he did not personally investigate the validity of the complaint against Defendant. Thus, the jury was informed that the Pennsylvania Securities Commission stopped its investigation once Defendant responded to its initial inquiry. Moreover, during the Government's direct examination of Mr. Fleming, defense counsel never objected that the testimony was being offered as "other bad acts." Therefore, trying to assert this objection, especially is such a perfunctory manner during this stage of the case, is unavailing for Defendant.

## III. CONCLUSION

For the foregoing reasons, the Court denied Defendant's post-trial motion for judgment of acquittal or, in the alternative, a new trial. The Order was entered on June 2, 2005 (doc. no. 64).